UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
TROMA ENTERTAINMENT, INC.,

      Plaintiff,

  - against -

CENTENNIAL PICTURES INC., et al.,

      Defendants.
------------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

11 Civ. 1137 (BMC)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ APR 10 2012 ★
BROOKLYN OFFICE

COGAN, District Judge.

 Defendants *pro se* have moved to dismiss this copyright infringement action on numerous grounds, principally lack of personal jurisdiction or improper venue. For the reasons set forth below, the motions are granted in part.

## BACKGROUND

 Viewing the facts in the light most favorable to plaintiff, see Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006); A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993); Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985), defendants engaged in a rather brazen theft of plaintiff's intellectual property.

 Plaintiff, a New York corporation, is the author or exclusive distributor of two popular, cult, "spoof" films called "Citizen Toxie, Toxic Avenger IV," and "Poultrygeist, Night of the Chicken Dead" (together, the "Films"). Plaintiff has contacts all over the world with film distributors, including, as most relevant to this action, Germany, and has entered into periodic license agreements for the Films in various geographic markets.

In September of 2009, defendant Lauter, a California resident, who operates through a d/b/a called "Pan Global Entertainment," represented to a German company called Intravest Beitelgungs GMBH ("Silverline") that he had the German distribution rights for the Films. In fact, he had no such rights at all. There was not even a colorable basis for him to claim that he did. But Silverline entered into a contract with him, taking an assignment of his German distribution rights, based on Lauter's representations of rights ownership in the agreement. To get Silverline the Films, Lauter simply went to Amazon.com's German website, Amazon.de, bought the films for a nominal sum like any consumer would, and provided them to Silverline, which ultimately broadcasted them in Germany.

Contemporaneously with Lauter's execution of the agreement with Silverline, Lauter's partner-in-crime, the defendant Robbins, also a California resident, approached plaintiff by email from Los Angeles in an effort to acquire the rights. Robbins did not tell plaintiff that Lauter had conveyed or was about to convey rights that he did not possess. He merely represented that he and his partner had a contact with a German company that might be willing to buy a license for the German exhibition of the Films. After much back and forth, plaintiff sent Robbins an email authorizing him not to enter into a deal with the unnamed German company, but to hold himself out as agent for plaintiff so that he could obtain a bid for the Films and present the bid to plaintiff for its approval. The email provided that if plaintiff accepted whatever deal Robbins might present, Robbins would get a percentage of the licensing fee. At no time did Troma either ratify the deal that Lauter had made – indeed, it did not even know of that deal – nor did it grant Robbins any discretion in finalizing terms for such a deal.

Robbins and Lauter attempted to portray this limited authority to Silverline as an absolute right to grant it a license to exhibit the Films in Germany, but Silverline became increasingly

2

suspicious and began demanding unqualified proof of their authority, in the form of a communication from plaintiff, which plaintiff had not given. Nevertheless, Silverline had exhibited the Films in Germany and ended up paying some or all of the consideration on which it had agreed with Lauter to him or Robbins.

Plaintiff did not learn that the Films had been fraudulently licensed and exhibited in Germany until nearly a year later. It then brought this action against Lauter and Robbins for copyright infringement.

## DISCUSSION

Robbins and Lauter are neither present nor doing business in New York. Plaintiff therefore predicates personal jurisdiction on the long-arm provision of N.Y. C.P.L.R. §302(a)(3)(ii). That statute allows a court in New York to exercise personal jurisdiction over an out-of-state defendant when the nondomiciliary "commits a tortious act without the state causing injury to person or property within the state …if he … expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Id.

For our purposes, the present case turns on whether defendants caused plaintiff's injury "within the state." In the context of commercial torts, the New York courts have made it clear that the mere presence of the plaintiff in New York (generally, a New York resident or a business headquartered in New York), is not sufficient, by itself, to deem the injury to have occurred in New York. The bank accounts of the plaintiff may be in New York, and they may ultimately have a smaller balance as a result of the nondomiciliary's tort, but that does not mean that the injury occurred "within the state." See Fantis Foods v. Standard Importing Co., 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 786-87 (1980) ("It has … long been held that the residence or domicile

3

of the injured party within a State is not a sufficient predicate for jurisdiction, which must be based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there."). To suffer an injury in New York, there thus must be something more than mere presence – some form of "plus factor." This plus factor may be that the defendant has stolen employees who were working for the plaintiff in New York and possessed trade secrets, see Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 413 N.Y.S.2d 127 (1978), or, more commonly, that sales that the plaintiff might have made to New York-based customers have been diverted to the non-domiciliary, see American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428 (2d Cir. 1971) (no "injury within the state" where lost sales were to customers in Kentucky and Pennsylvania). But there must be something beyond the plaintiff's New York location.

At first blush, this case would appear to fall squarely within the rule that mere New York residence is not enough to find an injury within the state. Lauter and Robbins did nothing in New York nor did they steal any New York sales, whether actual or potential. They stole a sale to a potential German customer, just as the defendants in American Eutectic stole sales to out-of-state customers. Plaintiff has not and cannot point to any contacts concerning the sale to Silverline between defendants and New York other than plaintiff's location.

Plaintiff, however, contends that the New York Court of Appeals' recent decision in Penguin Group (USA), Inc. v. American Buddha, 16 N.Y.3d 295, 921 N.Y.S.2d 171(2011), created a new and special rule applicable to copyright cases. Plaintiff contends that under this decision, the Court of Appeals recognized copyrights as a "bundle of rights" possessed by the copyright holder, and because those rights are attached to a New York plaintiff's residence, the

"injury within the State" occurs in New York when those rights are infringed. In effect, plaintiff argues that any time there is a copyright infringement – anywhere in the world – and the copyright is held by a New Yorker, then the defendant has caused an injury "within the state."

I agree that Penguin Group created a special rule attendant to copyrights – but I disagree with plaintiff that the mere infringement of a copyright held by a New Yorker is sufficient to trigger application of this rule. What Penguin Group was concerned with was not just copyrights, but the use of the internet to sell or exhibit purloined copyrighted material to anyone, including potential New York buyers. The defendant in Penguin Group had obtained copies of plaintiff's copyrighted works and had uploaded them to the internet from its servers in Arizona and Oregon, making those works available to not only the defendant's 50,000 subscribers, but anyone with an internet connection. In finding that this act had inflicted injury on the plaintiff "within the state," the Court of Appeals held:

> [I]t is clear that the Internet itself plays an important role in the jurisdictional analysis in the specific context of this case. ...
>
> The crux of Penguin's copyright infringement claim is not merely the unlawful electronic copying or uploading of the four copyrighted books. Rather, it is the intended consequence of those activities – the instantaneous availability of those copyrighted works on American Buddha's Web sites for anyone, *in New York or elsewhere*, with an Internet connection to read and download the books free of charge.

Id. at 304-05, 921 N.Y.S.2d at 175-76 (emphasis added). The emphasized language demonstrates that Penguin Group fits quite comfortably within those prior cases finding injury within the state where sales to potential New York customers are diverted. It expands current law, if at all, only by its assumption that since anyone can access the internet, New Yorkers can too. The Court of Appeals confirmed this by noting that

5

> the absence of any evidence of the actual downloading of Penguin's four works by users in New York is not fatal to a finding that the alleged injury occurred in New York. In Sybron, we made clear that a tort committed outside the state that was likely to cause harm through the loss of business inside the state was sufficient to establish personal jurisdiction regardless of whether damages were likely recoverable or even ascertainable.

Id. at 306, 304 N.Y.S.2d at 176-77 (citation omitted).

The Court further made it clear that it was the peculiar combination of the nature of copyright ownership *and* the use of the internet that required this special rule:

> The concurrence of these two elements – the function and nature of the Internet and the diverse ownership rights enjoyed by copyright holders situated in New York – leads us to view this case as closer to Sybron than Fantis Foods. ...
>
> [O]ur decision today does not open a Pandora's box allowing any nondomiciliary accused of digital copyright infringement to be haled into a New York court when the plaintiff is a New York copyright owner of a printed literary work.

Id. at 306-07, 304 N.Y.S.2d at 177-78.

The last sentence quoted above precisely states plaintiff's theory and rejects it. This is not an internet case. True, Lauter bought the Films from Amazon.de, but downloading is quite different from uploading, the latter of which makes the copyrighted material available to any purchaser or viewer, including New Yorkers. Lauter could have just as easily walked into a retail outlet and bought the DVDs to accomplish the scheme alleged here. Indeed, if the defendant in Penguin Group had somehow blocked internet access to the copyrighted works for New Yorkers – allowing anyone in the world to view them except New Yorkers – or had refused to permit sales to New Yorkers, it seems clear that the Court of Appeals would have reached the opposite result.

For this reason, plaintiff's reference to the fact that it has German customers and that, in fact, subsequent to defendants' contract with Silverline, it licensed the Films to a German

distributor, does not alter the analysis. Nor does it matter that with regard to these German customers, plaintiff uses the internet for sales and communications. Personal jurisdiction has to be predicated on defendants' actions, not plaintiff's. One actual German customer is not the same as some potential or actual New York customers who use the internet, and the loss of the latter is required for long arm jurisdiction under C.P.L.R. §302(a)(3)(ii). Personal jurisdiction is therefore lacking.

Because personal jurisdiction is lacking, there is no basis for venue in this district. <u>See</u> 28 U.S.C. § 1400(a). The remaining question is whether the Court should dismiss this action, as Robbins and Lauter have requested, or transfer it to the Central District of California, which is a proper venue and in which defendants are subject to personal jurisdiction. Plaintiff has seven days to advise the Court whether it has any position on this issue, failing which the action will be dismissed.

**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
April 9, 2012